UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S POSITION REGARDING SENTENCING |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael Benjamin Thompson, | ) | Criminal Nos. 25-215 (ECT) |
| | ) | |
| Defendant. | ) | |

Defendant Michael Benjamin Thompson, through his counsel subscribed, respectfully submits this Position Regarding Sentencing pursuant to Local Rule 83.10(e).

Congress has directed sentencing courts "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). With that mandate in mind, this position pleading summarizes Defendant's continuing objections to the presentence investigation report, it discusses important considerations regarding the history and characteristics of Defendant Thompson, and it specifically recommends a sentence of imprisonment of 120 months.

CONTINUED OBJECTIONS TO THE PRESENTENCE REPORT

Paras. 20 and 100: Mr. Thompson did *not* tell the agents during his interview that "he struggled for years with viewing to [sic] child pornography." (¶ 20). Nor is it true that "the defendant was self-proclaimed to struggle with viewing child

pornography." (¶ 100). The original versions of these paragraphs had referred to an "addiction" to child pornography, to which Defendant timely objected. The amendments to the paragraphs unfortunately did not correct the error at all; they simply rephrased it. To be clear, Mr. Thompson did not tell the agents that he struggled with or had an addiction to child pornography.

A careful review of his recorded statement reveals that Mr. Thompson expressly told the agents in no uncertain terms that he did *not* possess any child pornography. He invited them to look through everything he owned to assure them: "And, and you'll see there's like, uh, old drives up there. Look through all of them. None of them have anything, anything at all. No, I've never, I've never had child porn, ever." Statement, at 01:12:44. He even enthusiastically agreed to take a polygraph test when the agent suggested it, saying "let's go, let's go!" Statement, at 01:13:04; s*ee also* Statement, at 01:43:58 ("No, no, no, happy to come do a polygraph. Yeah, yeah"). The FBI later verified through its searches of Mr. Thompson's electronic devices that there was no evidence of contraband. *See* P.S.R. at paragraph 22. The statement was separately verified by private forensic computer examiner Jeff Wold, who noted after his review of Mr. Thompson's device at the FBI, "I performed many searches for activity related to CSAM, and found no indication that he sought, collected, viewed, or distributed any illegal content."

It is very unfortunate that these untrue and objectionable assertions were not

completely removed from the report. Mr. Thompson's entire (lengthy) discussion with the agents is available for review. A transcript also has been prepared. Mr. Thompson did make a reference to being addicted to adult pornography. *See* Statement, at 01:37:27 ("I also sought him out [referring to his therapist] for pornography addiction, you know"); *see also* Marston Report, at 17. And Mr. Thompson also has admitted to having *viewed* child pornography on a handful of occasions. *See,* Marston Report at 16. But he has *never* said that he was addicted to child pornography or that he "struggled" with viewing it. Indeed, to the contrary, he has specifically noted that "he has not been drawn to child pornography." Marston Report, at 17.

The confusion may have had something to do with Mr. Thompson's statements to the agents regarding his *other* struggles and addictions. He had conceded to them, for example, that he has struggled with an attraction to teenaged females, and that he carried a lot of shame about it, and that there was such social stigma about it that one couldn't even speak of it. Statement, at 00:39:12, 00:40:24, 00:41:56. He also conceded to them that he had an addiction to using the Omegle website:

> and then it became kind of an addiction for a while. Like, it was horrible. Yeah, it would take so much of my time and energy and like— yeah, like, I'm not fucking proud of it by any stretch, you know? But it wasn't like— it wasn't an intro to something that I was like, yeah, I'm gonna do that to like pick up girls or whatever, you know?

Statement, at 00:43:40.

Mr. Thompson's interview with the agents is quite remarkable for its length and

for his complete candor and willingness to discuss the most intimate details of his life. He was very emotional and honest about the offense conduct with the victim, and about his personal struggles and worries. Nowhere during the more-than-two-hour interview did he say that he struggles with viewing child pornography. His extensive discussions with Dr. Marston during the psychosexual evaluation are even more detailed, and there too, despite all manner of other honest concessions, he did not suggest any struggle with child pornography.

While the assertions objected to in these paragraphs probably have no direct impact on sentencing, and the Court might therefore be inclined to disregard the error and forego a ruling, these are precisely the kinds of false or misleading assertions that can be directly damaging to the progress and success of any treatment in the Bureau of Prisons (and perhaps thereafter). The BOP, of course, relies on the presentence report as true and makes programming decisions based on its contents. Mr. Thompson is eager to take advantage of any treatment options available while serving his sentence (and he made this very clear to the agents during his statement). If the treatment professionals are led to believe that the assertions in these paragraphs are true, that treatment may be misguided, and the therapists' assessment of Mr. Thompson's progress could prove to be a disaster when he provides them with a truthful accounting that is at odds with the assertions in the presentence report.

Para. 21: This paragraph says that it is quoting from "a passage" in a notebook.

That is overtly misleading. It is not "a passage"; it is rather a collection of random quotes cherry-picked from a six-page journal. It lacks all of the context, and therefore is not even an accurate summary of the statements.

Para. 22: This paragraph states that "no additional child pornography has been found on the defendant's devices." While it is true that no child pornography was found on defendant's devices, the word "additional" clearly suggests that some child pornography *was* found. There was no contraband found on Defendant's devices. The illicit image referenced in this paragraph was found on the victim's device.

OFFENSE CONDUCT

The conduct underlying the offense of conviction in this case began with Mr. Thompson befriending a teenaged girl in an on-line chat forum called Omegle, and later pursuing a relationship that crossed lawful boundaries by including mutual "sexting" in their on-line communications and eventually travel to Iowa to meet the girl in person and engage in sexual relations – despite her being only 14, which is two years younger than the Iowa age of consent.

ADDITIONAL SENTENCING CONSIDERATIONS

1. Sentencing Guidelines Considerations.

Defendant Thompson does not quarrel with how the guidelines were technically calculated, but like many others before him, he asks the Court to treat the application of the 5-level adjustment for "Repeat and Dangerous Sex Offender Against Minors"

pursuant to §4B1.5 with appropriate circumspection. This adjustment has been criticized in this district, and many others, as a mere sentence multiplier. Indeed, it has become so common that it is now routine in sex cases involving minors, without any policy support based on actual risk assessments. In this case, as in many others, it is triggered by formalistic criteria that permit a "pattern" to be based on the limited conduct of a single, short-lived relationship with the same victim.

Mr. Thompson, of course, is not a recidivist (the true target of the enhancement). Indeed, at almost 40-years-old he has no criminal history at all. The enhancement collapses the distinction between first-time and repeat offenders, resulting in a disproportionate advisory penalty that is much greater than necessary under the factors set forth in § 3553(a) as applied to this Defendant. The enhancement was meant for repeat and dangerous offenders (precisely why it is thusly titled), but it unfortunately applies to almost every offender convicted of a sex crime involving a minor. The application notes make clear that "[t]his guideline applies to offenders whose instant offense of conviction is a sex offense committed against a minor and who present a continuing danger to the public." U.S.S.G. § 4B1.5 (background). The best evidence that Mr. Thompson does not present a continuing danger is set forth in the comprehensive psychosexual evaluation by Dr. Marston, in Mr. Thompson's ready acceptance of responsibility and eagerness to address and rectify his offending behavior, and in the absence of any previous conduct constituting a danger to the

public. Because Mr. Thompson does not present the continuing danger that § 4B1.5 was meant to address, the enhancement's core premise is not satisfied, and the Court should discount its impact when taking into account the sentencing guidelines as it determines an appropriate sentence for Mr. Thompson.

2. Defendant's State of Affairs as he Appears for Sentencing, and the Circumstances Giving Rise to the Offense Conduct.

The presentence report documents much of Mr. Thompson's recent trauma and grief. Mr. Thompson was the only child of his parents Michael and Cheri. His father died unexpectantly in March 2025, shortly before his arrest. Mr. Thompson had been his mother's primary caretaker at the time because of her recent injuries and poor health, and she thereafter also died (in November 2025), while he was in custody awaiting resolution of these charges.[1] Preparation of a eulogy for his mother's memorial service has exhausted much of his creative energy in recent weeks.

But Mr. Thompson has not wasted any time while in custody awaiting resolution of this case. As the Court will see, he has dived into as much programming and therapy and community involvement as his current circumstances permit. He is energized and looking forward to making this isolated, but serious, mistake of judgment a turning point for the better in his life. He has kept exceptionally busy for an inmate in a county

---

[1] Before her passing, during an interview with Dr. Marston, Mr. Thompson had disclosed his premonition of her death as his greatest worry: "that I don't see my mother alive again.'" Marston Report, at 12.

jail. But that busy schedule has not interfered with his insistence on keeping in touch and being present for the friends and loved ones in his community on the outside. The dozens of letters of support from the people in his community speak volumes about how he has taken a serious setback in life and chosen to transform it into a tool for improvement.

It was only in retrospect that Mr. Thompson realized how an unusual set of life circumstances gave rise to the instant offense conduct. At the time of that conduct, before the added grief of the passing of his parents, Mr. Thompson had been suffering from a significant depression brought on by the very recent breakup of his relationship to his life partner of several years. Ashley was also his business partner, so the breakup was especially traumatic, as it also caused the demise of their joint entrepreneurial enterprise that had been showing great promise. As noted in the presentence report, among other imprudent choices, he turned to the regular use of cocaine after his breakup with Ashley. P.S.R. at para. 62. Dr. Marston's report provides more detail about that dark phase:

> Mr. Thompson said, at the time of his offense, while not an excuse, he was at a low point in his life, was obviously not thinking well or clearly at the time, was not taking care of himself and was abusing a variety of substances such as alcohol, cocaine and a benzodiazepine. He said he was miserable, experiencing significant grief over the loss of his life-partner at the time, grief over her father's suicide several months earlier, grief over his mother's repeated serious falls and injuries, including two broken hips that was taking her on a downward trajectory at age 65 and multiple uncertainties in his business and business partnership that included his life partner and that was falling apart.

Marston Report, at 12. Mr. Thompson is confident that but for this exceptionally dark phase in his life, he would never have found himself unable to exercise the judgment that would have averted the criminal conduct constituting the instant offense of conviction. He is confident that he now has the insight to avert a similar disaster in the future.

3. Therapeutic Malpractice.

Although it is difficult to assess its influence with precision, undersigned counsel joins with the assessment of Dr. Marston that Mr. Thompson may have been misguided and damaged by the therapeutic malpractice of a counseling charlatan whose license has since been revoked. As the presentence report notes, Mr. Thompson had sought the assistance of a therapist for various mental and sexual health concerns named Dr. Ryan Westrum. P.S.R. at para. 58. The presentence report acknowledges that Dr. Westrum lost his license to practice, so the writer did not request any records of that treatment. Dr. Marston's psychosexual evaluation provides more context:

> he said he has seen a personal therapist, Dr. Ryan Westrum, in Minneapolis from 2015-2025 twice a month on average and during some periods once a week. He said he sought therapy with Westrum for coping with "an adult pornography addiction" and to deal with the polyamorous relationship with his four years younger girlfriend, Lakshmi, who wanted a sexually open relationship and when he had problems with jealousy, and feeling hurt and unworthy in 2013-2018. I had intended to contact Dr. Westrum directly regarding this treatment, though, in the process of looking up his credentials, discovered that his license to practice as a Licensed Marital and Family Therapist had been "suspended indefinitely" in 2023 and may petition for reinstatement no sooner than

five years.

Marston Report, at 23. Apparently, among other questionable treatments, Westrum's practice included the administration of psilocybin to his clients, still a schedule I drug at the time, in violation of law and the ethical rules of his profession. *See, id*., at 23-24. Perhaps, had Mr. Thompson received competent counseling during the ten years previous to the offense conduct, we would not be here.

4. Extraordinary Acceptance of Responsibility.

The extraordinary acceptance of responsibility in this case is very unusual. As already discussed above, when confronted about visiting the underaged victim in Iowa and exchanging sexting messages and pictures with her, Mr. Thompson immediately acknowledged and expressed remorse for what he had done. Not only that, he continued over the course of more than two hours effusively to express his personal shame arising from his conduct in this case, from his struggles with hypersexuality, from the amount of time he had wasted viewing pornography, and from what he recognized as an unhealthy attraction to teenaged girls.

Mr. Thompson also talked at length to the agents about his desire for appropriate treatment, and the possibility that he would thank them later for giving him this opportunity. Indeed, listening to the lengthy conversation, and witnessing Mr. Thompson's extraordinarily heartfelt confessions, and a series of complete cycles of emotions, one senses that he was simultaneously both devastated and grateful. He was

obviously extremely fearful of the impending consequences, but eager to cooperate with the agents in any way they wanted, including his willingness to submit to polygraphs, providing security codes to his devices, and asking for their advice on how he could be more helpful, and what he should do to stay in touch after he was told he could leave. He has since followed through with his voluntary resolution of the case, continuing expressions of shame and remorse, and his on-going desire for appropriate therapy and counseling.

Mr. Thompson obviously hopes that he is not too long detoured in his life journey by whatever sentence of incarceration the Court imposes in this case. He completely acknowledges the crime he committed and the damage it has caused, but he is eager to turn this error into insight, to take advantage of any and all appropriate therapy and counseling, and to focus on moving forward and using this experience for self-improvement.

## SENTENCING RECOMMENDATION

The Court's sentencing discretion is limited by Congress to imposition of a term of imprisonment of no less than 120 months. There is no reason to justify imposition of a sentence that exceeds that sentence for this first-time offender. That sentence is certainly sufficient, and without doubt *greater* than necessary, to achieve all of the statutory purposes of sentencing in this case.

Dated: 28 April 2026

Respectfully submitted,

GERDTS LAW PLLC

s/ Daniel L. Gerdts

______________________________

Daniel L. Gerdts (#207329)
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
612-800-5086
daniel@danielgerdtslaw.com